**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CHARSETTA JOHNSON,

        Plaintiff,

vs.                            Case No. 3:05-cv-858-J-32TEM

BELLSOUTH LONG TERM DISABILITY PLAN
FOR NON-SALARIED EMPLOYEES,

        Defendant.

_____

**<u>ORDER</u>**[1]

    This case is before the Court on cross motions for summary judgment. Plaintiff, Charsetta Johnson, filed a Motion for Summary Judgment (Doc. 19), and defendant, BellSouth Long Term Disability Plan For Non-Salaried Employees, filed a Motion for Summary Judgment (Doc. 21). Defendant filed the Administrative Record (Doc. 24). The parties filed responses in opposition to the cross motions. (Docs. 26 & 27). The Court heard oral argument on June 27, 2006. (Doc. 29).

_____

[1]    Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically. However, it has been entered only to decide the motion or matter addressed herein and is not intended for official publication or to serve as precedent.

## I.    BACKGROUND

### A.    The Parties and Plan

This is an Employee Retirement Income Security Act ("ERISA") long term disability benefits case wherein plaintiff, Charsetta Johnson ("plaintiff"), has filed suit against the BellSouth Long Term Disability Plan for Non-Salaried Employees ("defendant") challenging the decision to deny long term disability benefits ("benefits"). Plaintiff was employed with BellSouth as a customer service representative.  As an employee with the requisite seniority, plaintiff was a "covered employee" under BellSouth's Long Term Disability Plan (the "Plan").  (Doc. 1-2 at pp. 1, 3).  BellSouth is the administrator and sponsor of the Plan.  (Id. at p. 7).  Under the Plan, BellSouth appoints an Employee Benefit Claim Review Committee ("EBCRC") to serve as the claim review committee.  (Id.).  The Plan, however, vests the EBCRC with authority to delegate its decision-making function to an agent "to approve or deny claims as may be required in the administration of the Plan."  (Id. at p. 8).  The plan further provides, "[t]he EBCRC (and its delegates) has complete discretionary authority to determine Benefits and to interpret the terms and provisions of the Plan.  Such determinations and interpretations shall be final and conclusive."  (Id. at p. 9).

The EBCRC delegated its authority to determine eligibility under the Plan to Broadspire Services, Inc. ("Broadspire") (f/k/a Kemper National Services, Inc.), an independent corporation.  (Doc. 23-1, Peavler Dec.).  While Broadspire makes eligibility determinations under the Plan, all benefits under the Plan are paid directly

from BellSouth's operating expense accounts "or from a trust established to the Company to fund a Voluntary Employees' Beneficiary Association (VEBA) under which such benefits are payable." (Doc. 1-2, p. 10).

The Plan defines "disability" as:

> [A] physical or mental illness, whether work-related or non-work related, which makes a Participant who has been covered under the Short Term Disability Plan for 52 weeks unable to perform <u>any type of work other than one which pays less than half of his base pay at the time his benefits under the Short Term Disability Plan begin</u>.... [A] participant's earnings potential shall be determined using potential jobs in the community. The earnings test shall take into account a participant's functional capacities, background, (education, training, work experience) transferable skills, and the participant's age. The geographic area searched for jobs will be within a 35-mile radius of a participant's home address and/or within his prior work location....

(<u>Id.</u> at p. 2) (emphasis added). To obtain benefits because of a disability, a covered employee must be "[d]isabled for a period beyond the waiting period as a result of illness or an injury." (<u>Id.</u> at p. 3). The "waiting period" is the 52 week period during which short term disability benefits are payable to a covered employee under the Plan. (<u>Id.</u>). Thus, any entitlement to long term disability benefits under the Plan does not begin until after the expiration of the 52 week term for short term disability benefits. (<u>Id.</u>).

## B.   Background Facts

On September 30, 2002, plaintiff ceased work with BellSouth due to falling ill

with Cushing's disease[2] secondary to pituitary adenoma (a tumor).  (A.R. 83, 110-11).

When plaintiff presented with Cushing's Disease, she was experiencing chronic

headaches, and also suffered from diabetes and hypertension.  (Id. at 83).   On

October 1, 2002, plaintiff underwent surgery to remove the pituitary tumor.  (Id. at

110-11).  After the surgery, plaintiff received short term disability benefits under the

Plan for 52 weeks, or until October 4, 2003.  (Id. at 629).  Plaintiff was denied long

term disability benefits under the Plan effective on that date.  (Id. at 668).

After her October 1, 2002 surgery, which was performed by neurosurgeon

Philip Henkin and otolaryngologist Jeffrey Brink, plaintiff was hospitalized until

October 8, 2002.  (Id. at 227).  On October 17, 2002, plaintiff's treating physician and

endocrinologist John Evans prepared an "Attending Physician Statement" and noted

that he was then currently unable to formulate a release date for plaintiff to return to

work, but that he would see her again on October 31, 2002, and that he expected

significant improvement by November - December 2002.  (Id. at 346).    Dr. Evans

_____

[2]   As defendant points out, WebMD.com provides that Cushing's Disease or
Syndrome "is a rare disorder that develops when the body is exposed to too much of
the hormone cortisol.  Cushing's Syndrome is also known as hypercortisolism.
Normally, cortisol levels increase through a chain reaction of hormones.  The brain's
hypothalamus produces corticotrophin-releasing hormone (CRH), which stimulates
the pituitary gland to make adrenocorticotrophic hormone (ACTH).   Then ACTH
stimulates the adrenal gland to produce cortisol."  Medhelp.org further explains that
cortisol is a normal hormone produced by the adrenal glands that helps the body
respond to stress and change.  Specifically, cortisol mobilizes nutrients, modifies the
body's response to inflammation, stimulates the liver to raise blood sugar, and helps
to control the amount of water in the body.  The overproduction of cortisol causes
significant stress on the organs and tissue in the human body.  The collective effects
of this stress is known as Cushing's Syndrome.

significantly restricted plaintiff's physical activities.  (Id.).

Similarly, on November 1, 2002, Dr. Brink prepared a treating physician's report and an "Attending Physician Statement" and noted that plaintiff could not return to work, even on a light duty basis, and further noted that he was unable to formulate a full duty return to work date.  (Id. at 352-53).  On November 18, 2002, however, Dr. Henkin noted that plaintiff could "probably" return to work on modified/ light duty for eight hours per day on November 23, 2002.  (Id. at 357-58).

On December 6, 2002, internal medicine physician and endocrinologist Sam Lerman performed a peer records review concerning plaintiff at Broadspire's request. (Id. at 241-42).    Upon performing the records review, Dr. Lerman concluded that, "[t]he submitted documentation does not demonstrate objective evidence of a functional impairment precluding the claimant from working at 'any occupation.' Based on this information, the claimant has undergone a successful transphenoidal resection of a pituitary tumor causing Cushing's [disease], and appears to be well enough to resume any work responsibilities that she had prior to surgery."  (Id. at 242).

On December 18, 2002, Dr. Brink informed Broadspire that he was still unable to formulate a return to work date for plaintiff.  (Id. at 246).  On January 22, 2002, Dr. Brink informed neurologist Vaughn Cohan that he had performed a three month post-surgical examination of plaintiff and that her symptoms of nasal vestibulitis and sinus problems had resolved.  (Id. at 253-54).   The following day, Dr. Cohan completed his

peer review of plaintiff's medical records and noted that as of January 6, 2003, plaintiff's treating physicians, Drs. Henkin (neurosurgeon) and Brink (otolaryngologist), "cleared [plaintiff] for a return to full duty as of January 6, 2003 at the latest." (Id. at 255-56). Dr. Cohan further noted that, "...therefore it is my opinion that the medical records submitted for review do not demonstrate evidence of a functional impairment which would have precluded the claimant from returning to work as of January 6, 2003. There is no evidence which would support disability from that date forward." (Id. at 255-56).

On January 27, 2003, plaintiff's primary care physician, Fara Nadal, prepared an "Attending Physician Statement." (Id. at 393). Dr. Nadal noted that he had last treated plaintiff on January 15, 2003 for stomach pain and that he was unable to formulate a release date for plaintiff to return to work. (Id.). However, Dr. Nadal referred Broadspire to Dr. Evans "who is actively managing [plaintiff's] Cushing Disease, diabetes and hypertension." (Id.).

On February 6, 2003, internal medicine physician John Rahaim performed an independent medical examination ("IME") of plaintiff. (Id. at 399). Dr. Rahaim noted that he had previously examined plaintiff in September 2002 and diagnosed her with severe hypertension and gastrointestinal dysfunction. (Id.). Plaintiff complained of headaches, weakness and vague pain in her legs. (Id.). Dr. Rahaim noted that it was "difficult" to grade the degree of plaintiff's disability "due to the multiple subjective symptoms"; however, he opined that "[plaintiff] can certainly try to return to her job at

least part time for the next month." (<u>Id.</u> at 400).  Dr. Rahaim recommended that plaintiff be evaluated by her neurologist and endocrinologist because of a recent black out spell and her continued diabetes insipidus. (<u>Id.</u>).  Dr. Rahaim noted that he was unsure as to how much motivation plaintiff had to return to work because of "severe" mental problems, which impeded her ability to function. (<u>Id.</u>).  Dr. Rahaim ultimately concluded that plaintiff could return to work for four hours a day in a seated job. (<u>Id.</u>).

On February 20, 2003, Broadspire scheduled a functional capacity examination ("FCE") with Heartland Rehabilitation.  (<u>Id.</u> at 415-16).  The purpose of the FCE was to determine plaintiff's capacity to perform the duties of "any occupation." (<u>Id.</u> at 415). The examiner found that plaintiff gave an "unreliable effort" during testing, but noted that plaintiff could perform lifting functions at the sedentary level, perform walking and sitting on a constant basis, reach to her immediate left and right on a frequent basis, and that she could climb stairs, stand, stoop, kneel and perform functions with her hands and fingers on an occasional basis. (<u>Id.</u>).  The examiner ultimately concluded that, "[plaintiff] demonstrates the ability to perform within the SEDENTARY physical demand classification as determined through the Department of Labor for a 4-6 hour day. [Plaintiff] performed with a sub-maximal, unreliable effort throughout the evaluation; therefore, results obtained should be considered a minimum of the evaluee's physical abilities...." (<u>Id.</u> at 415-16).

On March 3, 2003, the Social Security Administration ("SSA") issued a "Notice of Award" that adjudicated plaintiff disabled as of February 6, 2002, and that under

SSA rules, August 2002 was her first month of entitlement.  (Id. at 419).  The adjudication informed plaintiff that on or about March 9, 2003, she would receive $8,895.00 for benefits due since August 2002, and that she would thereafter receive $1,281.00 of benefits per month. (Id.).  The award also noted that, "[t]he doctors and other trained personnel who decided that [plaintiff] is disabled expect her health to improve.  Therefore, we will review [plaintiff's] case in August 2004."  (Id. at 421).

On March 13, 2003, internal medicine physician Russell Superfine performed a peer review of plaintiff's claims file.  (Id. at 266).  As part of his review, Dr. Superfine reviewed the IME findings of Dr. Rahaim and the FCE findings of Heartland Rehabilitation.  (Id. at 268).  Based on the IME and FCE, as well as plaintiff's medical records submitted from her other treating physicians, Dr. Superfine concluded that "[plaintiff] would be capable of performing the duties of any occupation."  (Id.).

On April 24, 2003, Dr. Evans (endocrinologist) sent a letter to Dr. Henkin (neurosurgeon), and noted that, "[plaintiff] generally is feeling well.  Her blood sugars are improved.  She is manifesting persistent postoperative diabetes insipidus for which she responds quite nicely to DDAVP nasal spray...."  (Id. at 432).

On June 12, 2003, Broadspire requested yet another peer review to be performed by physical medicine rehabilitation physician Eddie Sassoon.  (Id. at 448).  Dr. Sassoon was asked to review plaintiff's medical records and the IME and FCE reports to determine if there is support for disability from any occupation.  (Id.).  After recapitulating plaintiff's medical history and noting his review of the medical records

and reports, Dr. Sassoon concluded that:

> The medicals fails [sic] to support disability from any occupation based on the Functional Capacity Evaluation which revealed employability in a sedentary level of activities for at least 4-6 hours per day in addition to the findings from Dr. Rahaim in 02/2003 who felt the claimant could return to a sedentary level of activity on at least a part time basis based on her findings.  There is no evidence of acute medical instability documented....  Although the claimant has a history of hypertension and diabetes, there is no documentation of any hypoglycemic reactions or blood sugars over 400 and no evidence of malignant hypertension documented to preclude the claimant from performing a sedentary level of activities.  Therefore, documentation does not support disability from occupation.

(Id. at 449).

On June 30, 2003, plaintiff saw her primary care physician, Dr. Nadal, and complained of "deep intense burning" in her hips and lower extremities.  (Id. at 477).  Plaintiff also stated that her "migraines are getting bad again," and that "Dr. Evans [plaintiff's treating endocrinologist] does not listen to her."  (Id.).  Dr. Nadal diagnosed plaintiff with bilateral hip and lower extremity pain, low back pain, Cushing's Disease and chronic migraines.  (Id.).

On July 13, 2003, at Broadspire's request, Dr. Vaughn Cohan (neurologist) performed another peer review of plaintiff's medical records.  (Id. at 494).  Dr. Cohan held a telephone conference with plaintiff's neurologist, Dr. Mark Emas, three days prior to issuing his findings.  (Id.).  During that conversation, Dr. Emas informed Dr. Cohan that plaintiff's subjective symptoms are out of proportion to her objective physical examination findings.  (Id.).  Dr. Cohan also notes Dr. Emas' conclusion that plaintiff's objective findings are that plaintiff could perform a full time sedentary job.

-9-

(Id.).  Dr. Cohan also reviewed plaintiff's IME performed by Dr. Rahaim and the FCE performed by Heartland Rehabilitation and noted their findings (which were made in February 2003).  (Id.).  Dr. Cohan concluded that based on plaintiff's medical documentation and his conversation with Dr. Emas, there is no demonstration of "objective evidence of a functional impairment which would preclude the claimant from performing sedentary work on a full time 8-hour per day basis."  (Id.).

Ten days later, on July 23, 2003, Dr. Emas once again treated plaintiff.  (Id. at 495).  Dr. Emas noted that plaintiff was "very depressed," and that plaintiff had discontinued all of her medications one week prior to the appointment because "[plaintiff] can no longer deal with anything."  (Id.).  Dr. Emas recommended a consult for major depression, and prescribed plaintiff Zoloft.  (Id.).  Dr. Emas also noted that plaintiff "denies any suicidal ideation."  (Id.).

On August 21, 2003, endocrinologist Sam Lerman performed a second peer review of plaintiff.  (Id. at 510-11).  As part of the review, Dr. Lerman held a peer to peer interview with plaintiff's treating endocrinologist, Dr. Evans, on August 11, 2003.  (Id. at 511).  Dr. Lerman recapitulated Dr. Evan's comments during their conference in his report as follows:

> The claimant feels quite well and looks great.  Strength and stamina seem good.  Headaches seem to be improved and less frequent, but are still being evaluated.  A neurological evaluation is imminent with her neurologist, Dr. Emas.  Cortisone replacement therapy has been discontinued.  Pituitary adrenal axis is normal.  There is no biochemical evidence of the Cushing's syndrome.  Diabetes insipidus persists, but is well-controlled with nasal DDAVP administration.  In view of this, there is no evidence to support functional impairment at this time and the

claimant should be able to resume sedentary work.

(Id.).

On September 17, 2003, neurologist Mark Emas wrote a letter to plaintiff's treating physician, Fara Nadal, and opined that plaintiff "appears to be improving from a neurologic standpoint," and that "[h]er depression seems to be responding to Lexapro." (Id. at 513).

On October 7, 2003, Dr. A. Owusu of Life Counseling Center, Inc. evaluated plaintiff for depression. (Id. at 522-25). Plaintiff reported that she had a "depressed mood" and was "hopeless," but denied suicidal or homicidal thoughts, and stated that she quit taking all of her medications because they made her sick. (Id. at 522, 525). Plaintiff also complained that her primary care physician (Dr. Nadal) and her endocrinologist (Dr. Evans) "[do] not listen" to her. (Id. at 522). Dr. Owusu noted that plaintiff was "somewhat melodramatic" and that he "suspect[s] she may be manipulative." (Id. at 524).

On October 9, 2003, plaintiff was admitted to Baptist Medical Center with an admission diagnosis of "[m]ajor depressive episode single, versus recurrent severe, with suicidal ideation versus organic affective disorder with possible organic delusional disorder...." (Id. at 527). Plaintiff was admitted to Baptist after her endocrinologist, Dr. Evans, apparently told plaintiff she looked depressed and needed to go to Baptist Hospital. (Id.). Dr. Atul Shah evaluated plaintiff and noted that she was "alert and oriented with a neat appearance and affect was slight with depressed

mood and despondent demeanor." (Id.).  Plaintiff informed Dr. Shah that she had "suicidal ideation" and that she quit taking her medications as a method of suicide. (Id.).  Plaintiff apparently admitted herself to Baptist voluntarily and then changed her mind while she was there and sought to leave.  (Id. at 530).  Dr. Shah stated that he would allow plaintiff to leave Baptist, but it would be against medical advice to do so. (Id.).  Dr. Shah's diagnosis of plaintiff was organic affective disorder secondary to multiple medical conditions and perhaps organic delusional disorder, possible major depressive episode, recurrent, severe versus single severe with psychotic symptoms and passive suicidal behavior; Dr. Shah also noted plaintiff's stress related to dealing with her disability situation at work.  (Id. at 529-30).

On October 13 and 14, 2003, Dr. Richard Nay, Ph.D., performed an independent psychological evaluation of plaintiff at Broadspire's request.  (Id. at 601). Dr. Nay observed that plaintiff had a depressive affect and dysthymic mood, and "almost exhibited a mask-like facial expression at times."  (Id. at 603-04).  Dr. Nay also observed that plaintiff's "content of thought appeared to be within normal limits and there was no evidence of a formal thought disorder."  (Id. at 604).  Dr. Nay found that: (1) plaintiff's basic attention and concentration skills were adequate and within normal limits; (2) plaintiff was in the severe range of clinical depression; (3) plaintiff's symptoms and psychological problems were highly consistent with individuals honestly reporting their difficulties; (4) there were no emotional outbursts or displays of extreme emotionality and (5) there was no demonstration of any significant cognitive impairment in attention, concentration, and/or memory functions.  (Id. at

604-06).

On November 13, 2003, Broadspire enlisted psychologist Lawrence Burnstein to perform a peer records review of plaintiff from a psychological perspective.  (Id. at 627).  Dr. Burnstein reviewed plaintiff's medical records, primarily those from her visit with Dr. Nay.  (Id. at 628).  After reciting the overall findings of Dr. Nay, Dr. Burnstein concluded that, based on plaintiff's performance on the various tests administered to her during the independent psychological evaluation, "it cannot be determined that [plaintiff] suffers from impairments in psychological functioning which would preclude her from working at this time."  (Id.).

On December 24, 2003, Broadspire's vocational field care manager, Carrie Chapman, performed an Employability Assessment Report for plaintiff.  (Id. at 641).  Ms. Chapman interviewed plaintiff on December 22, 2003 and reviewed the following: (1) peer review of psychologist Lawrence Burnstein; (2) Dr. Richard Nay's psychological evaluation; (3) Heartland Rehabilitation's FCE of plaintiff; (4) neurologist Vaughn Cohan's peer review; (5) physical medicine and rehabilitation physician Eddie Sassoon's peer review; and (6) plaintiff's other medical records prior to February 25, 2003.  (Id.).  Ms. Chapman delineated plaintiff's work history and performed a Transferable Skills Analysis ("TSA") using the Department of Labor's Dictionary of Occupational Titles ("DOT") and the Occupational Access System.[3]  (Id. at 643).

---

[3]   The Occupational Access System is a computerized assessment tool to identify appropriate occupations for an individual based upon prior work experience, education level and physical capabilities.  (A.R. 643).

To find appropriate employment, Ms. Chapman also used a pay scale of $20,514.00 per year, or $9.86 per hour. (Id.). The analysis elicited three occupations that plaintiff could perform in Duval County, Florida - Insurance Clerk, General Office Clerk and Call Out Operator. (Id.). According to Ms. Chapman, all of these vocations matched plaintiff's physical and mental capabilities and paid above the appropriate range. (Id. at 645). Ms. Chapman also performed a Labor Market Survey to determine the availability of appropriate jobs within a 35 mile radius of plaintiff's Jacksonville, Florida home; eight open positions were located matching plaintiff's restrictions. (Id. at 650-55). Ms. Chapman concluded that plaintiff could obtain employment if she was motivated to do so. (Id.).

On January 22, 2004, Broadspire issued a letter to plaintiff denying her long term disability benefits under the Plan effective October 4, 2003 (i.e., the expiration of plaintiff's 52 weeks of short term disability benefits). (Id. at 668). In the denial letter, Broadspire recounted the findings of her treating physicians (neurologist Emas and endocrinologist Evans), the findings of the peer review physicians (neurologist Cohan, endocrinologist Lerman and psychologist Burstein), Dr. Richard Nay's independent psychological evaluation, and the results of her Functional Capacity Examination, the Transferable Skills Analysis and Labor Market Survey; Broadspire determined that plaintiff was not "disabled" under the Plan. (Id. at 668-69). The letter also informed plaintiff concerning how to inquire regarding re-employment with BellSouth, and that she could file an appeal within 180 days of receipt of the denial. (Id. at 670).

On May 13, 2004, plaintiff, via her attorney, appealed Broadspire's denial of benefits to Broadspire's Appeal Committee.  (Id. at 700).  As part of the appeal, Dr. Owusu at the Life Counseling Center provided a report dated February 23, 2004.  (Id. at 691).  At that time, Dr. Owusu diagnosed plaintiff with "major depression" and "severe health problems," and noted that "[plaintiff was] unable to work in part because she's on a lot of meds. that cause sedation and fatigue" and she "sometimes wishes she were dead."  (Id.).

Dr. Owusu again saw plaintiff on February 26, 2004 and noted that plaintiff "seems more lighthearted... She's a little better today but she doesn't know why." (Id. at 695).  On May 19, 2004, at plaintiff's attorney's request, Dr. Owusu performed a "Medical Assessment of Ability to do Work-Related Activities (Mental)."  (Id. at 704).  Dr. Owusu opined that plaintiff's "major depression" and "medical problems," and the combination of the two, "[made] it impossible for her to work."  (Id. at 705).  Dr. Owusu rates plaintiff's ability as "fair" or "poor/none" in virtually every sub-category of making occupational adjustments, performance adjustments and personal/social adjustments. (Id. at 705-06).  These sub-categories include following work rules, relating to co-workers, dealing with the public, using judgment, understanding, remembering and carrying out complex job instructions, understanding, remembering and carrying out detailed, but not complex job instructions, understanding, remembering and carrying out simple job instructions, behaving in an emotionally stable manner and demonstrating reliability.  (Id.).  Dr. Owusu also noted that plaintiff, while well groomed, was "apathetic with marked paucity in thought content."  (Id. at 706).

On May 31, 2004, at the request of plaintiff's attorney, plaintiff's treating physician, Fara Nadal, performed a "Treating Physician's Medical Assessment of Ability to do Work-Related Activities (Physical)." (Id. at 765). Dr. Nadal found that due to back and knee pain, plaintiff had significant physical limitations, including lifting less than 5-10 pounds, standing and/or walking less than 1 hour in an 8 hour day and sitting less than 1 hour in an 8 hour day. (Id. at 765-66). Dr. Nadal further opined that plaintiff should never climb, stoop, crouch, kneel or crawl. (Id. at 766-67). Dr. Nadal also opined that plaintiff was restricted in handling, feeling and seeing, and that she required rest periods throughout the day. (Id. at 767). Dr. Nadal also noted that plaintiff was unable to tolerate stress due to "ongoing depression." (Id. at 769).

On March 11, 2005, Broadspire's Appeals Coordinator requested that clinical and neuropsychologist Elena Mendelssohn, Psy.D., perform a peer review of plaintiff's claim file. (Id. at 740). Broadspire provided Dr. Mendelssohn with plaintiff's claims file, including the most recent examinations performed by Drs. Owusu and Nadal. (Id. at 741-43). After a detailed recapitulation of plaintiff's medical history and findings of the multiple physicians and peer review physicians, Dr. Mendelssohn found:

> 1.  The submitted documentation suggests that the claimant suffers some level of distress secondary to her medical conditions. While this may be true, the submitted documentation, overall, failed to provide sufficient examination findings documenting the presence of cognitive, emotional, and behavioral impairment precluding the claimant from performing any occupation. It appears that the claimant has required mental health intervention, yet, the documentation failed to substantiate the claimant suffers complete limitation in her functional ability based on her mental status. As

such, the information does not support a functional impairment from 10/04/03 forward.

2.      The documentation does not suggest restrictions or limitations on the claimant's work activities....

4.      While the claimant reports medication side effects, examination findings do not corroborate the presence of psychological incapacity due to these side effects.

5.      While the claimant reports various subjective complaints, examination findings do not corroborate the claimant's inability to work.

(Id. at 743).  Additionally, Dr. Mendelssohn noted Dr. Owusu's findings that plaintiff had difficulty following work rules, dealing with the public, handling stress at work and maintaining concentration and attention, and opined that Dr. Owusu failed to provide any examination findings to substantiate his opinions.  (Id.).

Further, on March 21, 2005, neurologist Vaughn Cohan performed a third peer review of plaintiff.  (Id. at 744).  Dr. Cohan reviewed a litany of plaintiff's medical records, including Dr. Nadal's May 31, 2004 findings.  (Id. at 744-749).  Dr. Cohan, among other things, recited the findings of Dr. Nadal and stated that he saw no evidence that (1) plaintiff was impaired in her upper extremities, (2) she had significant impairment of sensory function in her hands or (3) that there was any basis for visual impairment.  (Id. at 748).  Further, Dr. Cohan stated, "[i]n short, I do not find any evidence to support the opinions submitted by Dr. Nadal.  There is no evidence that Dr. Nadal has a particular specialty expertise in neurology, neurosurgery, endocrinology, ophthalmology, or orthopedics."  (Id.).  Dr. Cohan concluded, once again, that plaintiff's claim file fails to demonstrate objective evidence of functional

-17-

impairment that would preclude her from performing any occupation.  (Id.).

On March 23, 2005, ophthalmologist Jon Schmeyer performed a peer review of plaintiff's ophthalmology records submitted by plaintiff.  (Id. at 750-52).  Dr. Schmeyer noted that while plaintiff has advanced glaucoma, it did not materially impair her vision.  (Id. at 754).  Dr. Schmeyer noted that plaintiff's central visual acuity was 20/20 (right) and 20/25 (left).  (Id. at 754).  Dr. Schmeyer ultimately concluded that there were no visual restrictions or limitations that precluded plaintiff from working in a sedentary position.  (Id. at 752-54).

On April 11, 2005, Broadspire's Appeal Committee, via Ms. Nadine Stolarski, issued a letter to plaintiff setting forth her extensive medical history and affirming the denial of long term disability benefits under the Plan retroactive to October 4, 2003.  (Id. at 759-64).  The letter states that Broadspire reviewed the materials plaintiff submitted, the three additional peer reviews conducted since the original denial of benefits and the materials reviewed before the original denial.  (Id.).  Finally, the letter informed plaintiff of her right to file suit under ERISA.  (Id. at 764).  Plaintiff filed this suit on September 12, 2005.  (Doc. 1).

## II.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  The existence of some factual disputes between the parties will

not defeat an otherwise properly supported summary judgment motion; "the requirement is that there is no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The substantive law applicable to the causes of action at issue will identify which facts are material.  Id.

Further, "[i]n an ERISA benefit denial case ... in a very real sense, the district court sits more as an appellate tribunal than as a trial court.  It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." Curran v. Kemper Nat. Servs., Inc., 2005 WL 894840, *7 (11th Cir. 2005) (unpublished *per curiam* opinion) quoting Leahy v. Raytheon Co., 315 F.3d 11, 17-18 (1st Cir. 2002); accord Clark v. Hartford Life and Accident Ins. Co., 2006 WL 890660, *2 (M.D. Fla. April 6, 2006) (unpublished opinion).

## B.    Applicable ERISA Standards

Under ERISA, the plaintiff "has the burden of showing that [s]he is entitled to the 'benefits under the terms of [the] plan.'" Stvartak v. Eastman Kodak Co., 945 F.Supp. 1532, 1536 (M.D. Fla. 1996) (quoting 29 U.S.C. § 1132(a)(1)(B)) aff'd, 144 F.3d 54 (11th Cir. 1998).  ERISA provides no standard for reviewing decisions of plan administrators or plan fiduciaries.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 (1989).  After Firestone, the Eleventh Circuit adopted three separate standards for reviewing administrators' plan decisions: "(1) *de novo* where the plan does not grant the administrator discretion [i.e., the administrator does not exercise discretion in deciding claims]; (2) arbitrary and capricious [where] the plan grants the

-19-

administrator [such] discretion; and (3) heightened arbitrary and capricious where [the plan grants the administrator such discretion but] ... [he has] ... a conflict of interest." Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1134-35 (11th Cir. 2004) (quoting HCA Health Servs. of Georgia, Inc. v. Employers Health Ins. Co., 240 F.3d 982, 993 (11th Cir. 2001) (citation omitted)).

In Williams, the Eleventh Circuit recapitulated the applicable framework for analyzing "virtually all" ERISA plan benefit denials:

1.      Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

2.      If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

3.      If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

4.      If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

5.      If there is no conflict, then end the inquiry and affirm the decision.

6.      If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

Id. at 1137-38.

Based on the "virtually all" language in Williams, it appears at first blush that the six step analysis applies in every ERISA long term disability benefits denial case. See

id. at 1137-38.  The <u>Williams</u> court even footnoted this language and stated that "[w]e thus mean both benefits denials based on plan interpretations as well [as] on factual determinations, since many, if not most determinations will involve 'issues of both plan interpretation and fact,' ... and we will otherwise wait to be confronted by principled exception to say otherwise here."  <u>Id.</u> at 1137, n. 6.  Thus, one reading of <u>Williams</u> is that the Eleventh Circuit meant for the six step framework to apply to *all* ERISA cases, regardless of whether the administrator is vested with discretionary authority to determine eligibility for benefits or if there is a conflict of interest.  An equally plausible reading, however, is that <u>Williams</u> presupposes the "heightened arbitrary and capricious" standard applies, and that the "*virtually all*" refers only to cases where the conflict of interest exists.  <u>See id.</u> at 1135, 1137-38; <u>see also</u> <u>Anderson v. Unum Life Ins. Co. of America</u>, 414 F.Supp.2d 1079, 1102-03 n. 19 (M.D. Ala. Feb. 13, 2006).

The parties here, however, agree that the Court must apply the arbitrary and capricious standard to plaintiff's claim for long term disability benefits under BellSouth's Plan.  (Doc. 26).  This is because the Plan specifically vests the EBCRC and its delegates with complete discretionary authority to determine eligibility for long term disability benefits and interpret the provisions of the Plan.  (Doc. 1-2 at p. 9).  The EBCRC delegated its authority here to Broadspire.  (Doc. 23-1, Peavler Dec.).  Because Broadspire is an independent corporation and BellSouth is responsible for making any disability payments from its own assets, there is no conflict of interest; thus, the heightened arbitrary and capricious standard is not triggered.  <u>See</u> <u>Williams</u>, 373 F.3d at 1137-38.

Even though the parties agree the arbitrary and capricious standard applies to plaintiff's claim, it is not entirely clear under <u>Williams</u> and its progeny precisely how the district court is to undertake this review.  Again, <u>Williams</u> can certainly be read to require the district court to begin with step one in all long term disability denial cases and first undertake the de novo "wrong" analysis before it proceeds (if necessary) to the arbitrary and capricious analysis in steps 3 and 4.  Defendant, however, does not cite <u>Williams</u> in its motion for summary judgment; thus, ostensibly positing that <u>Williams</u> does not apply and the district court should proceed directly to the arbitrary and capricious analysis as the Eleventh Circuit has done in <u>Williams'</u> predecessor cases.  <u>See</u> <u>Turner v. Delta Family-Care Disability and Survivorship Plan</u>, 291 F.3d 1270, 1274 (11th Cir. 2002); <u>Paramore v. Delta Air Lines, Inc.</u>, 129 F.3d 1446, 1451 (11th Cir. 1997); <u>Buckley v. Metropolitan Life, et al.</u>, 115 F.3d 936, 939-40 (11th Cir. 1997).

Recognizing the uncertainty with the precise application of <u>Williams</u> to this case, the Court assumes *arguendo* that it reaches the arbitrary and capricious analysis (steps 3 and 4 of <u>Williams</u>).  "Under the arbitrary and capricious standard of review (sometimes used interchangeably with an abuse of discretion standard), the court seeks 'to determine whether there was a reasonable basis for the [administrator's] decision, based upon the facts as known to the administrator at the time the decision was made.'" <u>Hunt v. Hawthorne Assoc., Inc.</u>, 119 F.3d 888, 912 (11th Cir. 1997) (quoting <u>Jett v. Blue Cross and Blue Shield of Ala., Inc.</u>, 890 F.2d 1137, 1139 (11th Cir. 1989)).  "Normally, '[a] decision to deny benefits is arbitrary and

-22-

capricious if no reasonable basis exists for the decision.'" <u>Levinson v. Reliance Standard Life Ins. Co.</u>, 245 F.3d 1321, 1325-26 (11th Cir. 2001) (citation omitted). The arbitrary and capricious standard is the least demanding form of judicial review of administrative action.  <u>McDonald v. Western-Southern Life Ins. Co.</u>, 347 F.3d 161, 169 (6th Cir. 2003).

### C.    Arbitrary and Capricious Review

#### 1.    <u>The physical disabilities</u>

Plaintiff's physical diagnoses include (1) Cushing's Disease, (2) hypertension, (3) diabetes, (4) chronic headaches, (5) back pain, (6) pain in her hips and lower extremities and (7) glaucoma.   A panoply of medical professionals, including neurologists, endocrinologists, ophthalmologists, otolaryngologists, internists and general practitioners have treated and/or evaluated plaintiff's physical infirmities (including those who have performed peer records reviews) over a two and a half year period to ascertain her ability to work.  Ultimately, after reviewing plaintiff's entire claim file (including information submitted by plaintiff), Broadspire determined that plaintiff did not meet the Plan's definition of "disability" because of her physical infirmities. (A.R. 759-64). After a thorough review of the record, this Court cannot say Broadspire's decision that plaintiff could physically perform any occupation under the terms of the Plan was arbitrary and capricious.

In the appeal denial letter, Broadspire cited plaintiff's February 26, 2003 FCE report that concluded plaintiff was capable of performing a sedentary position for four

to six hours per day. (Id. at 415-16).  The appeal denial letter also cited neurosurgeon Philip Henkin's (who performed plaintiff's pituitary surgery) return to work note that plaintiff could "probably" return to modified duty for eight hours per day as early as November 23, 2002.  (Id. at 761, 357).  In addition to these opinions, neurologist Vaughn Cohan performed a peer records review of plaintiff and noted on January 23, 2003 that plaintiff's surgeons, Dr. Henkin and otolaryngologist Jeffrey Brink, told him that plaintiff was clear to return to full time duty as of January 6, 2003.  (Id. at 255-56).

Six months later, in July 2003, Dr. Cohan performed a second peer records review and likewise concluded that plaintiff had no impediment that precluded her from performing a full time sedentary job.  (Id. at 494).  Dr. Cohan noted that a conversation with plaintiff's treating neurologist, Dr. Mark Emas, assisted him in reaching that conclusion.  (Id.).  For a third time, in March 2005 (after the original denial of benefits, but before the final decision on appeal), Dr. Cohan performed a peer records review.  (Id. at 744-49).  Dr. Cohan assailed the findings of plaintiff's treating physician, Fara Nadal; Dr. Cohan saw no evidence that (1) plaintiff was impaired in her upper extremities, (2) that she had significant impairment of sensory function in her hands, and (3) there was any basis for visual impairment.  (Id.).  Dr. Cohan found, once again, that plaintiff was not functionally impaired from performing "any occupation."  (Id. at 748).

Endocrinologist Sam Lerman also performed two peer records reviews (December 6, 2002 and August 21, 2003), and concluded each time that plaintiff could resume full time sedentary work.  (Id. at 241-42, 510-11).  Dr. Lerman's second

peer review was based on his conversation with plaintiff's treating endocrinologist, John Evans, during which the physicians discussed that plaintiff's diabetes and pituitary function did not preclude her from working. (Id. at 511).

Further, internal medicine specialist John Rahaim concluded from his IME of plaintiff in February 2003 that she was immediately capable of returning to work in at least a part time (four hours per day) capacity. (Id. at 399-400). Similarly, internal medicine physician Russell Superfine concluded after his peer records review in March 2003 that plaintiff was capable of performing the duties of "any occupation." (Id. at 268). Finally, the results of ophthalmologist Jon Schmeyer's March 2005 peer records review of plaintiff were that, while plaintiff had glaucoma, it did not materially impair her vision (20/20 - right and 20/25 - left) or her ability to work in a sedentary position. (Id. at 752-54).

In all, at least nine physicians opined at various points spanning November 2002 through March 2005 (including at or near the critical October 2003 time period) that plaintiff was physically capable of performing "any occupation" under the Plan. While the Court notes that these various opinions are in stark contrast to that of plaintiff's treating physician, Dr. Nadal, (Id. at 765-69), the Court cannot conclude that Broadspire's decision to deny long term disability benefits to plaintiff, effective October 4, 2003, was arbitrary and capricious. This finding is further bolstered by the detailed results of the Employability Assessment Report and Labor Market Survey that show there is full time work available in Jacksonville, Florida commensurate with the terms

of the Plan.  (Id. at 641-45, 650-55).[4]

Plaintiff, however, cites the Supreme Court's decision in Black and Decker Disability Plan v. Nord, 123 S.Ct. 1965, 1972 (2003) for the proposition that "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the evidence of treating physicians."  While this is certainly correct, the Nord decision explicitly declines to adopt any "treating physician" rule, stating, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  Id.  However, not only did Broadspire credit the opinions of the peer records review physicians over that of Dr. Nadal, it also credited the opinions of multiple treating physicians whose opinions are diametrically opposed to those of Dr. Nadal.[5]  Because the Court finds no

_____

[4]    At oral argument, plaintiff criticized the Employability Assessment Report and the Labor Market Survey on the basis that they both presupposed that plaintiff was capable of performing part time work, without taking into account any restrictions placed on her by the treating physicians.  A review of the Employability Assessment Report shows that, in addition to the reports of the peer reviewers, Ms. Chapman considered the February 2003 FCE performed by Heartland Rehabilitation and "doctor and hospital notes prior to 2/25/03" (which would ostensibly include Dr. Rahaim's notes and findings of the February 2003 IME).  While one possible interpretation of the Employability Assessment Report is that Ms. Chapman primarily relied on input from the peer reviewers, and, to a lesser extent, that from the treating physicians, the ultimate finding that sedentary work with the required rates of pay is available in Jacksonville, Florida for plaintiff is not arbitrary and capricious.

[5]    Plaintiff relies on Godfrey v. BellSouth Telecomms., Inc., 89 F.3d 755, 758-59 (11th Cir. 1996) for the proposition that an administrator errs under an arbitrary and capricious standard when it fails to consider the viewpoints of treating physicians.  In

"arbitrary refusal" to credit the opinion of Dr. Nadal, the Court cannot conclude that Broadspire ran afoul of the Supreme Court's admonition in <u>Nord</u>.

Plaintiff also posits that Broadspire improperly credited the opinions of peer records review physicians (neurologist Cohan and endocrinologist Lerman), who relied on conversations with plaintiff's treating physicians to form their opinions. Plaintiff asserts that the administrative record (specifically the administrator's chronolog that documents work on plaintiff's file) does not corroborate that these discussions occurred.  As defendant points out, however, Dr. Cohan provided a detailed account of his July 10, 2003 conversation with Dr. Emas, (<u>Id.</u> at 287, 494), and Dr. Lerman likewise provided a similar description of his August 11, 2003 interview with Dr. Evans.  (<u>Id.</u> at 290, 511).  Thus, these conversations are sufficiently documented in the administrative record.

Any suggestion that the administrator acted arbitrarily and capriciously by relying on these conversations because they are hearsay is without merit.  Even assuming the treating physician's statements to the peer reviewing physician constitute hearsay, the administrator is not restricted by the Federal Rules of Evidence in making its decision.  See <u>Karr v. National Asbestos Workers Pension</u>

---

<u>Godfrey</u>, the Eleventh Circuit affirmed the district court's finding that the administrator acted in an arbitrary fashion when it "rejected the clear medical evidence [the plaintiff] submitted without even examining her themselves or seeking the treatment notes of her doctors."  <u>Id.</u> at 758.  Unlike in <u>Godfrey</u>, the administrator here reviewed all of plaintiff's treating physician notes, submitted plaintiff to an FCE and IME and hired numerous physicians spanning multiple disciplines to perform peer reviews of plaintiff's records.  The contrast in the scope of Broadspire's review in the present case and that in <u>Godfrey</u> is stark.

Fund, 150 F.3d 812, 814 (7th Cir. 1998) ("A pension or welfare fund trustee or administrator is not a court.  It is not bound by the rules of evidence."); see also Brown v. Board of Trustees of Bldg. Serv. 32B-J Pension Fund, 392 F.Supp.2d 434, 446 (E.D.N.Y. 2005) ("The administrative review conducted by the Trustees in an ERISA case is not a trial, and the Trustees are not bound to follow the Federal Rules of Evidence").  Further, because there are sufficient indicia of reliability in the reviewing physicians' iterations of these conversations, Broadspire was certainly entitled to rely on them in formulating its decision on plaintiff's long term disability benefits entitlement under the Plan.

Plaintiff also requests this Court to "give great weight" to the Social Security Administration's March 3, 2003 determination that plaintiff was disabled as of February 6, 2002.  (Id. at 419).  While this Court can certainly consider the SSA's determination in reviewing the plan administrator's decision regarding eligibility for benefits under ERISA, see Kirwan v. Marriott Corp., 10 F.3d 784, 790 n. 32 (11th Cir. 1994)(de novo review case), such a determination is not dispositive.  See Nord, 123 S.Ct. at 1971 (there are "critical differences between the Social Security disability program and ERISA benefit plans ..."); see also Pari-Fasano v. ITT Hartford Life and Acc. Ins. Co., 230 F.3d 415, 420 (1st Cir. 2000) ("[B]enefits eligibility determinations by the Social Security Administration are not binding on [ERISA] disability insurers").  Thus, while an SSA award of benefits may, in certain situations, militate toward a finding that ERISA disability benefits ought to also be awarded, the Court in the present case cannot conclude that the SSA's decision renders the administrator's

decision arbitrary and capricious.[6]

## 2.   Plaintiff's depression

The Court now addresses the portion of plaintiff's administrative appeal concerning her depression.   Even in light of plaintiff's bout with depression, Broadspire's denial of benefits was not arbitrary and capricious.  In the appeal denial letter, Broadspire cited the independent psychological evaluation performed by psychologist Richard Nay on October 13 & 14, 2003.  (Id. at 762-63, 601-06).  After administering a battery of tests to plaintiff, Dr. Nay noted that while plaintiff fell in the severe range for clinical depression, she "did not demonstrate any significant cognitive impairment in attention, concentration, and/or memory functions as compared to standardized norms."  (Id. at 606).  In addition, Dr. Nay's findings were validated by psychologist Lawrence Burnstein's peer records review, as well as that of clinical and neuropsychologist Elena Mendelssohn.   Dr. Burnstein found on November 13, 2003 (approximately five weeks after the effective date of the denial of long term disability benefits - October 4, 2003) that plaintiff's overall performance on the battery of tests administered by Dr. Nay "did not indicate impairments in cognitive functioning which would preclude her from performing work."  (Id. at 628).

_____

[6]   Plaintiff's social security award provides, in pertinent part, "[t]he doctors and other trained personnel who decided that [plaintiff] is disabled expect her health ro improve.  Therefore, we will review her case in August 2004."  (Doc. 24 at AR 421). At oral argument, the Court inquired whether any such review of plaintiff's claim for social security benefits has occurred, or whether there has been a change in the SSA's entitlement determination.   The parties informed the Court that they were unaware of any such review or change.

Dr. Mendelssohn also agreed that while plaintiff suffered depression secondary to her medical conditions, plaintiff's medical documentation did not suggest that any cognitive or behavioral impairment precluded her from performing any occupation. (Id. at 743). In her report, Dr. Mendelssohn criticizes Dr. Owusu's May 19, 2004 findings that "[plaintiff] had difficulty following work rules, dealing with the public, dealing with work stressors, maintaining attention and concentration, and behaving in an emotionally stable manner," because Dr. Owusu provided no examination findings to support his position. (Id.). Though the opinions of Drs. Nay, Burnstein and Mendelssohn are at odds with that of Dr. Owusu (plaintiff's treating psychologist), the Court cannot conclude that, even in view of any bona fide professional disagreement, Broadspire acted in an arbitrary and capricious fashion by crediting the opinions of a treating physician (Dr. Nay) and two peer records reviewing physicians over that of another treating physician.

Moreover, at oral argument, plaintiff argued that while multiple physicians made findings pertinent to plaintiff's health and ability to work, the vast majority of those were limited to each physician's specialty, and that no physician, other than Dr. Rahaim, considered plaintiff's physical infirmities in the aggregate. While it appears Dr. Rahaim may have performed the most comprehensive analysis of plaintiff during the IME, the record reveals that even as early as February 2003, he cleared plaintiff to return immediately to part time work and that numerous doctors (spanning multiple disciplines) thereafter did not place restrictions on plaintiff that would militate toward a disability finding under the plan. In addition, while plaintiff makes an interesting

observation that Dr. Rahaim may have been the only physician to consider plaintiff as a whole, in the ERISA context, the administrator is charged with taking the findings of all physicians and making an overall determination of disability.  On this record, the Court cannot say that Broadspire discharged that duty in an arbitrary and capricious fashion.

## III.    CONCLUSION

For the foregoing reasons, the undersigned will not disturb Broadspire's decision that plaintiff's physical conditions, depression, or the combination of plaintiff's physical and mental afflictions render her "disabled" under the Plan.  The Plan merely requires that plaintiff have the capacity to earn at least half of her base pay at the time she began obtaining short term disability benefits.  (Doc. 1-2 at p. 2).  Broadspire's determination, based on the administrative record, that plaintiff was capable of doing so effective October 4, 2003 was not arbitrary and capricious.   Accordingly, it is hereby **ORDERED**:

1)    Defendant, BellSouth Long Term Disability Plan For Non-Salaried Employees's, Motion for Summary Judgment (Doc. 21) is **GRANTED**, and Plaintiff, Charsetta Johnson's, Motion for Summary Judgment (Doc. 19) is **DENIED**.  Judgment shall enter in favor of defendant and against the plaintiff.

2)    Defendant's Motion to Exceed Page Limitation in its Motion for Summary Judgment (Doc. 20) is **GRANTED**

3)     The Clerk is ordered to close the file.


**DONE AND ORDERED** at Jacksonville, Florida this <u>26th</u> day of July, 2006.


TIMOTHY J. CORRIGAN
United States District Judge


t.
Copies: Counsel of Record